IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| DAVID K. SAYERS, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Civil Action No. 09-849-GMS |
| | ) |
| MICHAEL J. ASTRUE, | ) |
| Commissioner of Social Security, | ) |
| | ) |
| Defendant. | ) |

## MEMORANDUM

## I.    INTRODUCTION

The plaintiff David K. Sayers ("Sayers"), who appears *pro se*, appeals the decision of

Michael J. Astrue, Commissioner of Social Security ("Commissioner"), denying his claim for

disability insurance benefits ("DIB") prior to September 19, 2008, under Title II of the Social

Security Act, 42 U.S.C. §§ 401-433.  The parties have filed cross-motions for summary

judgment.  (D.I. 25, 27.)  The court has jurisdiction pursuant to 42 U.S.C. § 405(g).[1]

Sayers applied for DIB in December 2005, alleging disability as of July 22, 2004, due to

back, neck, knee, and shoulder impairments.  (D.I. 21, Tr. 118-123.)  His initial application was

denied on July 31, 2006, and a request for reconsideration was denied on June 1, 2007.  (*Id.* at

82-86, 89-93.)

---

[1]Under § 405(g), "[a]ny individual, after any final decision of the Commissioner of Social
Security made after a hearing to which he was a party . . . may obtain a review of such decision
by a civil action commenced within sixty days after the mailing to him of notice of such decision
. . . .  Such action shall be brought in the district court of the United States for the judicial district
in which the plaintiff resides . . . .  42 U.S.C. § 405(g).

Thereafter, Sayers requested a hearing, which took place before an administrative law judge ("ALJ") on February 23, 2009. Counsel represented Sayers at the hearing, and Sayers and a vocational expert ("VE") testified. (*Id.* at 34-76.) The ALJ found that Sayers was disabled beginning on September 19, 2008, his 55th birthday, but was not disabled prior to his 55th birthday. (*Id.* at 31-31, ¶ 11.) Sayers sought review by the Appeals Council, and it was denied on August 21, 2009. (*Id.* at 1-3.) On October 8, 2009, while represented by counsel, Sayers filed the instant action for review of the final decision as to the finding of the date that he first became disabled. (D.I. 1.) Sayers now proceeds *pro se.*

## II.      BACKGROUND

Sayers was born on September 19, 1953. (D.I. 21, Tr. 39.) He is a high school graduate with past work experience as a Canine Unit Supervisor for the Maryland Department of Correction where he last worked on July 22, 2004. On that date, he was injured when he slipped and fell down concrete steps at work. He received medical treatment and was discharged in stable condition with a plan to contact an orthopedic surgeon. (*Id.* at 40, 144, 149, 233, 235-36.)

### A.      Medical Evidence

As a result of the July 22, 2004 fall, Sayers sustained a closed head injury, a wrist fracture, and a right knee sprain. (D.I. 21, Tr. 233, 235.) Sayers began treating with orthopedist Richard Kang, M.D. ("Dr. Kang") on July 28, 2004, for neck pain, low back pain, right shoulder pain, right wrist pain, and right knee pain. (*Id.* at 246.) On that date, Dr. Kang wrote Sayers a prescription for a cane. (*Id.* at 247.) Sayers was assessed as having cervical and lumbar spine strain. (*Id.* at 248.) In August 2004, Dr. Kang referred Sayers to neurologist Richard E. Bird, M.D. ("Dr. Bird") to evaluate Sayers' closed head injury. (*Id.* at 238.) Dr. Bird opined that the

2

fall resulted in a concussion and that Sayers would need physical therapy for his neck and back. (*Id.* at 238- 239.) By early October 2004, Dr. Kang observed that Sayers was slowly improving. (*Id.* at 243, 245.) Sayers had complaints of pain, rating it as a five out of ten. (*Id.* at 245.) Because Dr. Kang no longer accepted workers' compensation cases, Sayers was advised to continue his case with a different physician. At the last visit on October 6, 2004, Dr. Kang assessed Sayers with persistent right knee pain, possible medial meniscal tear; cervical sprain/strain, still significantly painful but improving with therapy; lumbar sprain/strain with persistent pain, also improving slowly with therapy; right wrist pain, nearly resolved; and multiple neurologic and psychiatric issues. (*Id.* at 243.)

In October 2004, Sayers presented to orthopedist Jeffrey S. Cuomo, M.D., ("Dr. Cuomo") with significant complaints of pain in his right knee and right shoulder. (D.I. 21, Tr. 333.) Dr. Cuomo assessed Sayers as having an intraarticular right knee injury, and ordered an MRI. (*Id.* at 334, 525-26.) In addition, Dr. Cuomo had Sayers follow-up with neurologist Dr. Julius Zant ("Dr. Zant") for a workup and evaluation of persistent cervical spine pain. (*Id.*) Sayers received conservative treatment of the right shoulder through physical therapy. (*Id.* at 331.)

Dr. Zant treated Sayers for cervical and lumbar spine issues in December 2004 and assessed him as having "mostly mechanical pain," with no tract long signs or root signs on examination. (D.I. 21, Tr. 277.) Dr. Zant ordered an x-ray of the lumbar spine that revealed mild to moderate degenerative disc disease and degenerative joint disease changes. (*Id.* at 275, 282.) The x-ray suggested a compression fracture at L4. (*Id.* at 275.) Dr. Zant sought an evaluation by neurologist Peter R. Sebastian, D.O. ("Dr. Sebastian"). (*Id.*)

In December 2004, Dr. Cuomo surgically repaired Sayers' torn right knee meniscus through arthroscopy surgery. (*Id.* at 271-73, 330.) Three weeks following knee surgery, Sayers had good range of motion, although he still had some pain and a limp using the lower extremity. (*Id.* at 329, 521.) Dr. Cuomo reported that Sayers' shoulder was "markedly improved" following physical therapy; however, overhead positioning of his arm still caused some pain and difficulty. (*Id.*) As of February 7, 2005, Dr. Cuomo reported that Sayers was making progress with regard to the quadriceps muscle, and he wrote a prescription for physical therapy. (*Id.* at 328, 520.)

Sayers saw Dr. Sebastian on January 25, 2005. (D.I. 21, Tr. 312, 314, 320.) Dr. Sebastian assessed Sayers with unresolved mechanical dysfunctions of the lower cervical and upper thoracic region, restricted in his right shoulder, a vertebral fracture, and right knee issues. (*Id.* at Tr. 313.) At the January 25th visit, Dr. Sebastian completed a "disability certificate" stating that Sayers was "totally incapacitated" from January 25, 2005 through March 1, 2005. (*Id.* at 311, 323.) Dr. Sebastian prescribed therapy to include treatment for lower back with gentle manual techniques. (*Id.*) Sayers received physical therapy for an eight week period, twice a week. (*Id.* at 291-310.) He made complaints of pain at each session. (*Id.*)

Sayers was seen by Dr. Sebastian on February 1, 4, and 17, 2005. (D.I. 21, Tr. 536-38.) On February 17, 2005, Dr. Sebastian opined that Sayers would be unable to perform his past work as a correctional officer, and he doubted Sayers would be able to perform heavy lifting or be involved with physically restraining inmates.[2] (*Id.* at 532-535.) As of May 20, 2005, Dr. Sebastian had seen Sayers a total of seven visits. In his May 23, 2005 Physician's Medical

---

[2]In March 2005, Sayer was referred to Dr. Eugene K. Sawyer ("Dr. Sawyer") for a "workability evaluation." (D.I. 21, Tr. 286-90). Dr. Sawyer concluded that Sayers was unable to return to work and safely perform his essential job duties as a correctional officer. (*Id.* at 289.)

Report Dr. Sebastian wrote under prognosis, "doubt further significant improvement. will not return to corrections office duty capabilities." (*Id.* at 319.)

When Sayers saw Dr. Cuomo on March 11, 2005, he relayed overall "his pain to be improved," but he had significant back pain. (*Id.* at 327, 519.) Dr. Cuomo noted that Sayers was making steady improvement and that the swelling and pain were secondary to knee arthritis. (*Id.*) On April 8, 2005, Sayers stated that he felt he was making improvement. (*Id.* at 326, 518.) His quadriceps strength was returning although still decreased, and he had good range of motion. (*Id.*) Dr. Cuomo reported, "I think he is making favorable improvement and progress" . . . however, I feel if his pain continues he would be a good candidate for a Synvisc series of injections. (*Id.*)

Alon Davis, M.D. ("Dr. Davis") is Sayers' primary care physician. Sayers presented to Dr. Davis in January 2006 with complaints of chronic back pain. (D.I. 21, Tr. 449.) Musculoskeletal examination revealed myalgia, back pain, and decreased range of motion of the back. (*Id.*) Sayers was referred to physical therapy. (*Id.*) In late February 2006, Dr. Davis referred Sayers to an orthopedist. (*Id.* at 448.) In early April 2006, Sayers complained of worsening back and knee pain. (Id. at 447.) Dr. Davis found that Sayers was unable to stay in a sitting or standing position for twenty minutes, he had decreased range of motion in the neck, decreased flexion in the lumbar region, and knee, back, and neck pain. (*Id.*) Sayers continued to complain of back pain in late April 2006. (*Id.* at 446.) Dr. Davis reviewed the MRIs of Sayers' back and neck and referred him for physical therapy. (*Id.*)

In April 2006, Sayers returned to Dr. Cuomo for follow-up and presented with a recent increase of an achy pain with prolonged standing and high levels of activity. (*Id.* at 325, 517.)

Dr. Cuomo indicated that the symptoms were related to degenerative changes. (*Id.*) Sayers received a steroid injection into his right knee for pain relief. (*Id.*) On June 30, 2006, Sayers received the first of three Synvisc injections for his knee, the last one on July 14, 2006. (*Id.* at 514-16.)

Sayers was first seen by pain specialist Dr. Thomas Rosenthal, M.D. ("Dr. Rosenthal") in May 2006. Treatment for neck and low back pain consisted of a series of epidural steroid injections that Sayers received in May, June, July, and August 2006. (D.I. 21, Tr. 365, 367-68, 373-74.)

On June 23, 2006, Sayers underwent a consultative physical examination by Kartik Swanithan, M.D., ("Dr. Swanithan") at the request of the Delaware state agency. (D.I. 21, Tr. 350-52.) Sayers related that he had severe neck pain, chronic low back pain, right knee pain, and used a TENS unit. (*Id.* at 350.) Sayers indicated that he was unable to sit, stand, squat, go up and down steps or stand for prolonged periods of time or walk for prolonged periods of time. He was not able to lift anything greater than ten to fifteen pounds. (*Id.*) Dr. Swanithan's impression was that Sayers had cervical facet arthropathy; cervical radiculopathy with clinical evidence for a C5-C6 radiculopathy, lumbar facet arthrophy, and lumbar radiculopathy; internal derangement of the knee with MRI positive for degenerative changes, complex tear of right medial meniscus and sprain of the medial collateral ligaments; evidence for right shoulder rotator cuff tendinitis with MRI positive acrominoplasty and tendinopathy. (*Id.* at 351-52.) Dr. Swanithan noted that Sayers used a cane, walked with a broad-based gait with poor balance, and had some loss of balance with closing his eyes. (*Id.* at 352.)

State agency medical consultant, Richard D. Carter, M.D. ("Dr. Carter"), reviewed Sayers' medical evidence in July 2006, completed a residual functional capacity ("RFC") assessment, and opined that Sayer retained the capacity to occasionally lift twenty pounds, frequently lift ten pounds, stand and/or walk about six hours in an eight hour workday, sit about six hours in an eight hour workday, engaged in unlimited push and/or pull, with postural limitations of occasional climbing of stairs or ramps, balancing, stooping, kneeling, crouching, and crawling, but no climbing ladders/ropes/scaffolds.  (D.I. 21, Tr. 356-63.)  Dr. Carter did not have a treating or examining source statement regarding Sayers' physical capacities in the file. (*Id.* at 362.)  Dr. Carter relied upon the consultative physical examination performed by Dr. Swanithan, medical notes from Dr. Rosenthal, Dr. Davis, and AquaCare, as well as MRI reports that were available to him at the time.  (*Id.* at 363.)  The RFC findings were affirmed upon reconsideration.  (*Id.* at 502.)

During a follow-up visit with Dr. Davis in late August 2006, Sayers' examination indicated back, joint, and knee pain.  (*Id.* at 445.)  Dr. Davis and Sayers discussed his back pain and treatment with medications, physical therapy, and epidurals.  (*Id.*)  At this visit, Dr. Davis completed a medical assessment report and stated that Sayers did not have the capacity to be on his feet for prolonged periods of time; did not have the strength and endurance necessary to perform on a sustained, regular, and continuous basis the lifting of objects weighing a maximum of 20 pounds to frequently lift and carry objects weighing up to 10 pounds; and that the intensity and duration of Sayers' symptoms, along with any side-effects of his medications, would cause substantial restrictions in his capacity for sustained mental alertness, concentration, and

persistence in carrying out simple job duties in a competitive work environment over a regular eight hour workday. (*Id.* at 505-06.)

Sayers presented to Dr. Rosenthal on August 23, 2006 and at that time indicated that his pain was five out of ten. (*Id.* at 365.) Sayers advised Dr. Rosenthal that his pain was somewhat improved with the series of injections, but that he had pain with activity, any prolonged sitting, or standing. (*Id.*) Sayers had been prescribed a TENS unit, and when he saw Dr. Davis on September 28, 2006, he related that the TENS unit and physical therapy were helping with the pain. (*Id.* at 444.) On that date, Sayers rated his pain as a five out of ten. (*Id.*)

As of March 2007, Sayers exhibited an "excellent prognosis" at the time of discharge "from skilled rehabilitative therapy in conjunction with a home exercise program." (*Id.* at 460.) No objective measurements were taken on that day. Sayers' complaints of knee pain of "current severity" of two out of ten  and  "severity at worst" of seven out of ten, had decreased to zero and one, respectively, by March 12, 2007. (*Id.* at 460.) In addition, Sayers' complaints of spine pain of "current severity" of four out of ten and "severity at worst" of nine out of ten, had decreased to zero and one, respectively.[3] (*Id.*)

In 2007, Dr. Davis saw Sayers in January, June, July, August, and October. (*Id.* at 443, 556-57, 559, 561-62.) In January 2007, Sayers complained of back and right knee pain. (*Id.* at 443.) In mid-June 2007, Sayers presented to Dr. Davis and advised that he had fallen at home

---

[3]Sayers received physical therapy for his right shoulder, right knee, low back, and neck on numerous occasions in 2004 through 2007. (D.I. 21, Tr. 375-437, 459-501.) September 26, 2006 notes states that Sayers' pain of the lower back and neck was four out of ten and that the pain was aggravated as follows: sit/stand for long period of time, bending activities, tying shoes, lifting, running, driving for periods. (*Id.* at 378.) When Sayers was evaluated on October 25, 2006, he had loss of range and motion in the spine and he experienced pain with all range of motion. (*Id.* at 379.)

and had worsening back pain. (*Id.* at 562). Sayers reported that physical therapy was "helping generally." (*Id.*) The following month, Sayers reported to Dr. Davis that medication was helping and that his pain was a five on a scale of ten. (*Id.* at 561.) He had back pain, spasms, and decreased flexion. (*Id.*) In mid-August 2007, Sayers saw Dr. Davis regarding his back pain and reported that physical therapy traction was helping. (*Id.* at 559.) He continued to use a cane, had joint swelling and joint pain. (*Id.*) During Sayers' October 2007, he reported his pain as five on a scale up to ten; worse with activity. (D.I. 21, Tr. 557.) For treatment, Sayers used a TENS unit, a hot tub, and was taking medication, which he reported was helping. (*Id.*) Sayers continued with use of a cane. (*Id.*)

Sayers saw Dr. Cuomo on November 14, 2007, and he complained of increasing knee pain. (*Id.* at 513.) Upon examination there was significant low back discomfort. (*Id.*) Dr. Cuomo's notes state that Sayers had a "favorable response" to Synvisc. (*Id.*) Sayers underwent a series of three Synvisc injections beginning on December 4, 2007. (*Id.* at 510-11.) In February 2008, Sayers reported to Dr. Cuomo that the injections "significantly helped his symptoms," although he still has some medial sided pain. (*Id.* at 509.) Upon examination, there was a lot of pain involving the lumbar spine and a radicular component radiating down the right leg. (*Id.*)

When Sayers saw Dr. Rosenthal in April 2008, he indicated that he had done "relatively well for about a year." (*Id.* at 579). Dr. Rosenthal's notes indicate that Sayers had a good response to previous injections and used a TENS unit, as well as two traction devices for his cervical spine issues. (*Id.*) Dr. Rosenthal administered another epidural steroid injection on May 8, 2008. (*Id.* at 578.)

Sayers presented for follow-up with Dr. Davis in mid-April 2008 regarding his chronic back and neck pain. (*Id.* at 555.) In addition, Sayers complained of right arm pain, which Dr. Davis assessed as medial epicondylitis. (*Id.*) Dr. Davis examined Sayers on October 2, 2008, and his impression was chronic pain syndrome and degenerative joint disease. (*Id.* at 554.)

Sayers saw Dr. Sebastian in October 2008 for a left elbow consultation. (D.I. 21, Tr. 530-31.) At this time, Sayers' medications included Ultram and Skelaxin, as needed, and Lyrica, with an occasional anti-inflammatory drug such as Aleve. (*Id.* at 530.) Upon examination, Dr. Sebastian concluded that there was a "significant arthritic change" in the left elbow. His plan was to refer Sayers to Dr. Cuomo for a surgical consultation. His impression was that Sayers had continuing issues with pain and restriction in his right shoulder and upper back. (*Id.* at 531.) Sayers presented to Dr. Cuomo in October 2008, with complaints of left elbow pain. (*Id.* at 507.) An x-ray revealed significant degenerative changes in the elbow joint and Dr. Cuomo recommended surgery.[4] (*Id.* at 507-08.)

Drs. Sebastian, Cuomo, and Davis each completed their own Medical Assessment Report in December 2008 and January 2009. Dr. Sebastian had last seen Sayers on December 17, 2008, Dr. Cuomo had last seen Sayers on October 22, 2008, and Dr. Davis had last seen Sayers on October 2, 2008.[5] They each independently concluded that Sayers did not have the capacity to be on his feet for prolonged periods of time; did not have the strength and endurance necessary to

---

[4]Throughout his treatment Sayers underwent various diagnostic studies, including MRIs of the right shoulder, right knee, lumbar spine, and cervical spine; an x-ray of the lumbar spine and x-rays of the cervical spine, lumbar spine, and left elbow. (D.I. 21, Tr. 282-84, 337-38, 344-46, 348-349, 454-56,5 528, 564-65).

[5]Sayers turned 55 on September 19, 2008. The ALJ factored in his advanced age in finding disability as of the date he turned 55.

perform, on a sustained, regular, and continue basis, the lifting of objects weighing a maximum

of 20 pounds to frequently lift and carry objects weighing up to 10 pounds; and that the intensity

and duration of Sayers' symptoms, along with any side-effects of his medications, would cause

substantial restrictions in his capacity for sustained mental alertness, concentration, and

persistence in carrying out simple job duties in a competitive work environment over a regular 8

hour workday. (*Id.* at 541-42, 543-44, 547-48.)

Dr. Sebastian diagnosed arthritis of the left elbow, bilateral hip, spine, right knee, right

should restrictions, compression fracture with multiple areas of pain, restricted movement, very

limited activity tolerance, depression. (D.I. 21, Tr. 541.) Dr. Cuomo listed Sayers' diagnoses as

osteoarthritis of the forearm and osteoarthritis localized in the right knee, and opined that Sayers'

functioning precluded his ability to work. (*Id.* at 547-48.) Dr. Cuomo stated that Sayers has

significant degenerative changes in the right knee, documented by x-ray, MRI, and surgical

arthroscopy. (*Id.*) On examination he has shoulder pain, requires a cane to ambulate and has an

arthritic left elbow with a limited range of motion. (*Id.*)

Dr. Davis diagnosed chronic pain syndrome of the cervical and lumbar spine, left elbow

pain with severe arthritic changes, a compression fracture at L4, and a right meniscal tear. (*Id.* at

543.) He assessed functional limitations that would preclude work. (*Id.* at 544-46.) Dr. Davis

stated that Sayers required a cane to assist in ambulation, had chronic back pain that resulted in

change of positions frequently, was limited in lifting and carrying with the left arm, had limited

ambulation, had progressive and severe degenerative joint disease in the left elbow and in

multiple vertebrae, and had limited improvement with physical therapy and steroid epidurals

administered by Dr. Rosenthal. (*Id.* at 544-45, 566.)

11

### B.    February 23, 2009 Administrative Hearing

#### 1.    Sayers' testimony

Sayers was represented by counsel and testified at the hearing that the impairments precluding his ability to work include constant severe pain in his neck, lower back, right knee, and left elbow, as well as arthritis in his hands. (D.I. 21, at 43, 52.) The neck pain radiates into his left shoulder and arm "on a daily basis all day long." (*Id.* at 44.) He described the pain as constant at six or seven on a scale of one to ten. (*Id.* at 45.) Treatment provides temporary relief, and he can function somewhat better. (*Id.* at 46.) At the time of the hearing, Sayers was receiving treatment for his neck. (*Id.* at 44.)

In addition, Sayers continues with treatment for his back. At the time of the hearing, he has just finished "a run of physical therapy." (*Id.* at 46.) Sayers has back pain on a daily basis. The pain in his back is relatively constant and radiates down the right buttocks and into the right leg. (*Id.* at 47.) The pain worsens depending on what Sayers is doing. (*Id.*) In addition, he has stiffness and back spasms. (*Id.*) The back pain is from six to eight on a scale of one to ten. (*Id.* at 48.) Sayers receives epidural injections in his neck and back that provide temporary relief. (*Id.* at 48.) The relief may last a week up to a couple of months. (*Id.* at 65.)

Sayers had arthroscopy performed on his right knee and has received two rounds of Synvisc injections. (*Id.* at 48.) The injections help to alleviate a constant throb, providing Sayers does not "overdo it." (*Id.* at 48.) Sayers controls the knee pain by limiting his activity. (*Id.* at 49.) The knee pain stays around a five or six on a scale of one to ten. (*Id.*) Sayers testified that treatment has stabilized the knee. (*Id.*)

Sayers also has left elbow pain. (*Id.* at 50.) The elbow is arthritic and the condition is progressive. (*Id.* at 51.) Sayers engaged in physical therapy for the condition in the latter part of 2008. (*Id.*) Surgery has been recommended for the condition. (*Id.*) Sayers testified that he has severe arthritis in his hands and problems with his shoulder. (*Id.* at 52.) Finally, he testified that he suffers from depression. (*Id.* at 54.)

Sayers takes quite a bid of medication. (*Id.* at 44.) The medication causes lethargy and affects his short-term memory. (*Id.* at 55.) Sayers has purchased different therapeutic devices for use at home, and they provide temporary relief. (*Id.* at 55-56.) Sayers walks with a cane that was prescribed by a physician.[6] (*Id.* at 50.)

It is difficult for Sayers to sit leaning over a table for any length of time. (*Id.* at 53.) He can walk 100 to 150 yards and that would take him about five minutes. (*Id.* at 56-57.) He no longer uses stairs. (*Id.* at 57.) He can stand for 30 to 40 minutes and sit for 30 to 40 minutes until he has to get up, move, and change positions.[7] (*Id.*) Sayers testified that he had a driver's license and is only able to drive short distances from five to ten minutes. (*Id.* at 40, 62.) Sayers testified that he does not do any grass cutting.[8] (*Id.* at 62.)

---

[6] Dr. Davis, a family practice physician, is Sayers' primary care physician. (D.I. 21, Tr. 67.) Sayers has been a patient of Dr. Davis for at least fifteen years. (*Id.*) Sayers also sees the following physicians on a regular basis: Dr. Sebastian, Dr. Cuomo, and Dr. Rosenthal. (*Id.* at 68-69.)

[7] The ALJ found that the medical record reflected that Sayers was able to mow the lawn, bend, lift, run, drive, and sit and stand for moderate periods. (D.I. 21, Tr. 24.) She based this upon physical therapy records that stated Sayers' pain was aggravated by sitting or standing for long periods of time, bending, lifting, running or driving for long periods, even though the medical records do not indicate that he actually performed many of those activities. (*Id.* at 18.)

[8] During physical therapy, Sayers indicated that he had received a TENS that had helped with activities such as mowing the lawn. (D.I. 21, Tr. 378.) Sayers indicated in a physical

Sayers has not tried to lift anything that weighs more than "just a couple of pounds." (*Id.*) He has difficulty bending and kneeling. (*Id.* at 58.) On a typical day he spends three to four hours lying down. (*Id.* at 70.) Over the past two years he has suffered two falls. (*Id.*) He sleeps no more than two to three hours at any given time. (*Id.* at 59.)

He is able to perform personal hygiene, but needs assistance from his spouse for anything that requires bending over. (*Id.* at 60.) He does not perform any household chores, do the laundry, or grocery shopping. (*Id.* at 61.) His day consists mostly of sitting around.[9] (*Id.* at 64.) He has a little dog that keeps him company, but his wife takes care of the dog.[10] (*Id.*)

### 2.    The Vocational Expert

Following Sayers' testimony, the ALJ consulted the VE. The VE classified Sayers' prior relevant work (correctional officer supervisor) as semi skilled and of a medium exertional level. The VE identified no transferable skills from this work history.

The ALJ then asked the VE to consider two hypothetical questions. The first hypothetical, asked by the ALJ was as follows:

---

activities questionnaire, dated March 27, 2006, that he could ride his lawn tractor for approximately thirty minutes at a time, but needs to take frequent breaks, it is not comfortable and causes increased discomfort for a few days afterwards. (*Id.* at 178, 181.) The ALJ stated that the medical record as a whole reflects that Sayers was able to mow the lawn.

[9]The ALJ found that Sayers' testimony was not consistent with his reported abilities in the medical record. (*Id.* at 24.) She noted that Sayers' testimony occurred in February 2009, "which apparently reflected his most recent functional status and not his functional status prior to September 19, 2008." (*Id.* at 24-25.) Neither the ALJ, nor Sayers' counsel, elicited testimony from Sayers specifically directed to his functional abilities for the time period prior to September 19, 2008.

[10]The ALJ incorrectly stated that Sayers cared for the pet. (*Id.* at 21.)

We'll be talking now about a hypothetical person who is the claimant's stated age at onset. That would be 50 years of age. Has a twelfth grade education and work history that you just talked about. There are certain underlying impairments that place limitations on the ability to do work related activities. We'll start at a light level of exertion.[11]  Posturals are all occasional but no climbing of a ladder, a rope or a scaffold. This person should avoid working overhead and environmentally should avoid concentrated exposure to extreme cold, wetness or humidity as well as hazards defined as moving machinery or heights. Handling, fingering would be frequent rather than constant and due to pain and medication side effects, although this person has a semiskilled work background, he would be limited to simple, unskilled work. . . . Would there be any simple, unskilled work such a person could do in the regional or national economy that would fit within the parameters of the hypothetical. Maybe several at light, several at sedentary,[12] if you can.

(D.I. 21, Tr. 71-72.)  In response, VE explained that this hypothetical individual would be able to perform the representative jobs of gate tender and library clerk at the light level of exertion and the position of dispatcher routing clerk at the sedentary level and that these jobs exist in significant numbers in the local and national economies.  (*Id.* at 72.)  When the ALJ added the limitation that the hypothetical individual ambulated with the use of a cane, the VE eliminated the job of gate tender and substituted light, unskilled position of a copier operator.  (*Id.* at 73.)

---

[11]Light work is defined in the Social Security Regulation as follows:  (b) Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time. 20 C.F.R. § 404.1567(b).

[12]Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met. 20 C.F.R. § 404.1567(a).

Counsel for Sayers asked the VE to add to the original hypothetical that the individual would be: (1) unable to maintain a mental alertness, concentration, persistence in carrying out even simple job duties; (2) medically anticipated to be absent from work at least thirty days out of a year on an unscheduled basis; or (3) required to lie down at least four hours out of an eight hour day. The VE opined that these factors would negate all positions proffered in the two hypothetical questions. (*Id.* at 74.)

### C.    The ALJ's Findings

Based on the factual evidence and the testimony of Sayers and the VE, the ALJ determined that Sayers was disabled beginning September 19, 2008. (D.I. 21, Tr. 13-33.) The ALJ found that Sayers was not disabled prior to September 19, 2008, and, therefore, was not eligible for DIB beginning on July 22, 2004 and ending on September 18, 2008. (*Id.*) The ALJ's findings are summarized as follows:[13]

> 1. The claimant met the insured status requirements of the Social Security Act through December 30, 2010.
>
> 2. The claimant has not engaged in substantial gainful activity since July 22, 2004, the alleged onset date (20 C.F.R. §§ 404.1520(b), 404.1571 *et seq.*).
>
> 3. Since the alleged onset date of disability, the claimant has had the following severe impairments: cervical and lumbar degenerative disc disease, osteoarthritis, cervical and lumbar radiculopathy, lumbar facet arthropathy, obesity, broad based gait status post arthroscopy, partial medial and lateral menisectomy, and chondroplasty of the right knee (20 C.F.R. § 404.1520(c)).
>
> 4. Since the alleged onset date of disability, the claimant has not had an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 C.F.R. § Part 404, Subpart P, Appendix 1 (20 C.F.R. § 404.1520(d)).

[13]The ALJ's rationale, which was interspersed throughout the findings, is omitted from this recitation.

5.  Prior to September 19, 2008, the date the claimant became disabled pursuant to his 55th birthday, the claimant had the residual functional capacity to perform simple, unskilled light work as defined in 20 C.F.R. § 404.1567(b) except that he could lift 20 pounds occasionally, 10 pounds frequently, stand or walk for 6 hours in an 8 hour day, sit for 6 hours in an 8 hour day, occasionally climbing a ramp or stairs, kneeling, crouching, crawling, stooping and balancing but never climbing a ladder, rope or scaffold, avoiding overhead work, avoiding concentrated exposure to extreme cold, wetness, humidity and hazards with frequent rather than constant handling and fingering and requiring the use of a cane for ambulation.

6.  Beginning on September 19, 2008, the claimant's 55th birthday, the claimant has had the residual functional capacity to perform light work as defined in 20 C.F.R. § 404.1567(b) except that he could lift 20 pounds occasionally, 10 pounds frequently, stand or walk for 6 hours in an 8 hour day, sit for 6 hours in an 8 hour day, occasionally climbing a ramp or stairs, kneeling, crouching, crawling, stooping and balancing but never climbing a ladder, rope or scaffold, avoiding overhead work, avoiding concentrated exposure to extreme cold, wetness, humidity and hazards and frequent handling and fingering and requiring with the right arm, only occasion use of the left arm, and requiring the use of a cane for ambulation.

7.  Since the alleged onset date of disability, the claimant has been unable to perform past relevant work (20 C.F.R. § 404.1565).

8.  The claimant was born on September 19, 1953 and was 55 years old, which is defined as an individual closely approaching advanced age, on the alleged disability onset date (20 C.F.R. § 404.1563).

9.  The claimant has at least a high school education and is able to communicate in English (20 C.F.R. § 404.1564.

10.  Prior to September 19, 2008, transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills.  Beginning on September 19, 2008, the claimant has not been able to transfer any job skills to other occupations (*see* SSR 82-41 and 20 C.F.R. § Part 404, Subpart P, Appendix 2).

11.  Prior to September 19, 2008, considering the claimant's age, education, work experience, and residual functional capacity, there were a significant number of jobs in the national economy that the claimant could have performed (20 C.F.R. §§ 404.1560(c), 404.1566).

12. Beginning on September 19, 2008, considering the claimant's age, education, work experience, and residual functional capacity, there are not a significant number of jobs in the national economy that the claimant could perform (20 C.F.R. §§ 404.1560(c), 404.1566).

13. The claimant was not under a disability, as defined by the Social Security Act, prior to September 19, 2008, but became disabled on that date, his 55th birthday, and has continued to be disabled through the date of this decision (20 C.F.R. § 404.1520(g)).

(D.I. 21, 15-33.)

## III.   STANDARD OF REVIEW

### A.   Motion for Summary Judgment

Both parties filed motions for summary judgment pursuant to Federal Rule of Civil Procedure 56(c). In determining the appropriateness of summary judgment, the court must "review the record as a whole, 'draw[ing] all reasonable inferences in favor of the non-moving party [,]' but [refraining from] weighing the evidence or making credibility determinations." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000) (citation omitted). If the court determines that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law, summary judgment is appropriate. *See Hill v. City of Scranton*, 411 F.3d 118, 125 (3d Cir. 2005) (quoting Fed. R. Civ .P. 56(c)).

### B.   Review of the ALJ's Findings

The court must uphold the Commissioner's factual decisions if they are supported by "substantial evidence." *See* 42 U.S.C. § 405(g). Substantial evidence does not mean a large or a considerable amount of evidence. *Pierce v. Underwood*, 487 U.S. 552, 565 (1988) (citing *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). Rather, it has been defined as "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept

18

as adequate." *Ventura v. Shalala*, 55 F.3d 900, 901 (3d Cir. 1995) (quoting *Richardson v.*

*Perales*, 402 U.S. 389, 401 (1971)).

Credibility determinations are the province of the ALJ, and should be disturbed on review

only if they are not supported by substantial evidence. *Pysher v. Apfel*, 2001 WL 793305, at *2

(E.D. Pa. July 11, 2001) (citing *Van Horn v. Schweiker*, 717 F.2d 871, 973 (3d Cir. 1983)).

Thus, the inquiry is not whether the court would have made the same determination, but rather,

whether the Commissioner's conclusion was reasonable. *See Brown v. Bowen*, 845 F.2d 1211,

1213 (3d Cir. 1988). In social security cases, this substantial evidence standard applies to

motions for summary judgment brought pursuant to Fed. R. Civ. P. 56(c). *See Woody v.*

*Secretary of the Dep't of Health & Human Serv.*, 859 F.2d 1156, 1159 (3d Cir. 1988).

## IV.    DISCUSSION

### A.    Regulatory Framework

Within the meaning of social security law, a "disability" is defined as the inability to do

any substantial gainful activity by reason of any medically determinable physical or mental

impairment, which can be expected to result in death, or which has lasted or can be expected to

last, for a continuous period of not less than 12 months. *See* 42 U.S.C. § 423(d)(1)(A). To be

found disabled, an individual must have a "severe impairment" which precludes the individual

from performing previous work or any other "substantial gainful activity which exists in the

national economy." *See* 20 C.F.R. § 404.1505. The claimant bears the initial burden of proving

disability. *See* 20 C.F.R. § 404.1512(a); *Podeworthy v. Harris*, 745 F.2d 210, 217 (3d Cir.

1984). To qualify for disability insurance benefits, the claimant must establish that he was

disabled prior to the date he was last insured. *See* 20 C.F.R. § 404.131; *Matullo*, 926 F.2d at 244.

To determine disability, the Commissioner uses a five-step sequential analysis. *See* 20 C.F.R. § 404.1520; *Plummer v. Apfel*, 186 F.3d 422, 427-28 (3d Cir. 1999). "The claimant bears the burden of proof at steps one through four, and the Commissioner bears the burden of proof at step five. *Smith v. Commissioner of Soc. Sec.*, 631 F.3d 632, 634 (3d Cir. 2010). If a finding of disability or non-disability can be made at any point in the sequential process, the Commissioner will not review the claim further. *See* 20 C.F.R. § 404.1520(a)(4). At step one, the Commissioner must determine whether the claimant is engaged in any substantial gainful activity. *See* 20 C.F.R. § 404.1520(a)(4)(I) (mandating a finding of non-disability when claimant is engaged in substantial gainful activity). If the claimant is not engaged in substantial gainful activity, step two requires the Commissioner to determine whether the claimant is suffering from a severe impairment or a combination of impairments that is severe. *See* 20 C.F.R. § 404.1520(a)(4)(ii) (requiring finding of not disabled when claimant's impairments are not severe). If claimant's impairments are severe, at step three the Commissioner, compares the claimant's impairments to a list of impairments (the "listing") that are presumed severe enough to preclude any gainful work.[14] S*ee* 20 C.F.R. § 404.1520(a)(4)(iii); *Plummer*, 186 F.3d at 428. When a claimant's impairment or its equivalent matches an impairment in the listing, the claimant is presumed disabled. *See* 20 C.F.R. § 404.1520(a)(4)(iii). If a claimant's impairment, either singly or in combination, fails to meet or medically equal any listing, the analysis continues to steps four and five. *See* 20 C.F.R. § 404.1520(d).[15]

---

[14]Additionally, at steps two and three, claimant's impairments must meet the duration requirement of twelve months. *See* 20 C.F.R. § 404.1520(a)(4)(ii-iii)

[15]Prior to step four, the Commissioner must assess the claimant's residual functional capacity ("RFC"). *See* 20 C.F.R. § 404.1520(a)(4). A claimant's RFC is "that which an

At step four, the Commissioner determines whether the claimant retains the RFC to perform his past relevant work. *See* 20 C.F.R. § 404.1520(a)(4 )(iv) (stating a claimant is not disabled if able to return to past relevant work). "The claimant bears the burden of demonstrating an inability to return to his past relevant work." *Plummer*, 186 F.3d at 428. If the claimant is unable to return to his past relevant work, step five requires the Commissioner to determine whether the claimant's impairments preclude him from adjusting to any other available work. *See* 20 C.F.R. § 404.1520(g) (mandating that a claimant is not disabled if the claimant can adjust to other work); *Plummer*, 186 F.3d at 428. As previously stated, at this last step the burden is on the Commissioner to show that the claimant is capable of performing other available work before denying disability benefits. *See Plummer*, 186 F.3d at 428. In other words, the Commissioner must prove that "there are other jobs existing in significant numbers in the national economy which the claimant can perform, consistent with his medical impairments, age, education, past work experience, and [RFC.]" *Id.* This determination requires the Commissioner to consider the cumulative effect of the claimant's impairments and a vocational expert is often consulted.

At step one, the ALJ found that Sayers met the insured status requirements of the Social Security Act through December 30, 2010, and that he had not engaged in substantial gainful activity since July 22, 2004. At step two, the ALJ found that Sayers has the combination of severe impairments of cervical and lumbar degenerative disc disease, osteoarthritis, cervical and lumbar radiculopathy, lumbar facet arthropathy, obesity, broad based gait status post arthroscopy,

---

individual is still able to do despite the limitations caused by his or her impairment[s]." *Fargnoli v. Massanari*, 247 F.3d 34, 40 (3d Cir. 2001) (quoting *Burnett v. Commissioner of Soc. Sec. Admin.*, 220 F.3d 112, 121 (3d Cir. 2000)).

partial medial and lateral menisectomy, and chondroplasty of the right knee. At step three, the

ALJ determined that Sayers' impairments do not meet or medically equal the listing criteria.[16] At

step four, the ALJ determined that Sayers could not perform his past relevant work. At step five,

the ALJ concluded that prior to September 19, 2008, Sayers retained the residual functional

capacity ("RFC") to perform unskilled light work with additional limitations and that there were

a significant number of jobs in the national economy that Sayers could perform, as defined in 20

C.F.R. § 404.1560(c) and § 404.1566, but that beginning on September 19, 2008, considering

Sayers' age, education, work experience, and residual functional capacity, there were not a

significant number of jobs in the national economy that the claimant could perform, as set forth

in 20 C.F.R. § 404.1560(c) and § 404.1566.

### B.    Whether the ALJ's Decision is Supported by Substantial Evidence

Sayers objects to the Commissioner's determination on the following grounds: (1) the

ALJ afforded improper weight to the opinions of his treating physician, Dr. Davis, his treating

neurologist, Dr. Sebastian, and his treating orthopaedic surgeon, Dr. Cuomo; (2) the ALJ failed

to properly evaluate Medical Listing 1.02(A) at Step 3 of the sequential evaluation; (3) the ALJ

failed to properly analyze the onset of disability within the mandates of SSR 83-20 and failed to

call upon the services of a medical expert, but instead mechanically applied the mechanic grid;

and (4) the ALJ ignored evidence and took evidence out of context.

Sayers argues that the ALJ failed to give proper weight to his treating physicians. The

Commissioner responds that the ALJ may discount a treating physician's opinion when it is

---

[16]Sayers contests the step three determination.

inconsistent with the evidence and further, the ALJ provided support in her decision to afford reduced weight to the opinions of Drs. Davis, Cuomo, and Sebastian.

When an ALJ accepts the opinion of the non-examining state agency physician, the ALJ is required to include the functional limitations identified by that source in the RFC finding and hypothetical question. *See Ramirez v. Barnhart*, 372 F.3d 546, 552 (3d Cir. 2004). Further, the ALJ explicitly must weigh all relevant, probative and available evidence and provide some explanation for the rejection of probative evidence that would suggest a contrary disposition. *Adorno v. Shalala*, 40 F.3d 43,48 (3rd Cir. 1994) (citing *Dobrowolsky v. Califano*, 606 F.2d 403, 407 (3d Cir. 1979) and *Brewster v. Heckler*, 786 F.2d 581, 584 (3d Cir. 1986)). Conclusory statements are beyond meaningful judicial review. *Burnett v. Commissioner of Social Sec. Admin.*, 220 F.3d 112, 119 (3d Cir. 2000). An ALJ's decision must be accompanied by a clear and satisfactory explanation of the basis on which it rests in order for this court to properly decide whether the ALJ's decision is based upon substantial evidence. *Cotter v. Harris*, 642 F.2d 700, 704-05 (3d Cir. 1981).

In considering the medical opinion evidence in the instant case, the ALJ gave "little weight" to the opinions of Sayers' treating physician Dr. Davis and treating orthopaedic surgeon Dr. Cuomo. The ALJ determined that Dr. Davis' conclusions were inconsistent with the record and his own treatment notes and that his lack of expertise in vocational training and occupational health coupled with his speciality in general medicine did not provide a balance review of Sayer's limitation. The ALJ concluded that Dr. Cuomo's opinion was not consistent with his treatment notes, that Dr. Cuomo relied upon Sayers' subjective complaints of pain to guide the

completion of his opinion, and that his opinion was provided to allow Sayers to engage in a recuperative period following knee surgery.

With regard to treating neurologist Dr. Sebastian, the ALJ gave "little weight," and "some weight," to his opinions. The ALJ gave "little weight" to the opinions made by Dr. Sebastian during the time-period the ALJ found that Sayers not disabled. The ALJ determined that Dr. Sebastian's opinions were not consistent with the medical record as a whole and further, she discounted his assignment of remaining limitations on the basis that they were provided to allow Sayers to engage in a recuperative period following his injuries. However, the ALJ assigned "some weight" to Dr. Sebastian's opinion rendered after September 19, 2008 (i.e., that Sayers did not have the capacity to be on his feet for prolonged periods of time; did not have the strength and endurance necessary to perform, on a sustained, regular, and continue basis, the lifting of objects weighing a maximum of 20 pounds to frequently lift and carry objects weighing up to 10 pounds).

The ALJ gave "great weight" to the opinion of the state agency medical consultant, Dr. Carter, that found Sayers capable of light work with additional limitations. (D.I. 21, Tr. 29.) The record reflects that the ALJ's hypothetical questions did not include the limitations as outlined by Dr. Carter that the Sayers could stand or walk for 6 hours in an 8 hour day, and sit for 6 hours in an 8 hour day with an unlimited ability to push and pull. Accordingly, remand on this issue appropriate.

In addition, the ALJ's reliance on the non-examining state agency source opinion is flawed because his opinion was rendered upon an incomplete record. Specifically, Dr. Carter did not have available to him medical exhibits submitted into the record subsequent to the time that

he offered his opinion in July 2006.  In spite of this fact, the ALJ relied upon his opinion in finding no disability prior to September 19, 2008, even though his opinion did not include the entire time frame.

For these reasons, the court finds remand is appropriate for a more comprehensive evaluation.[17]

## V.    CONCLUSION

For the aforementioned reasons, the court remands the case for further proceedings consistent with this memorandum.  Sayers' motion for summary judgment is granted and the Commissioner's motion for summary judgment is denied.

_____
CHIEF, UNITED STATES DISTRICT JUDGE

_Sept 10_____, 2012
Wilmington, Delaware

_____

[17]In light of the court's findings, it is unnecessary to address Sayers' remaining arguments.